Matter of O'Connor v Cutting (2018 NY Slip Op 07379)





Matter of O'Connor v Cutting


2018 NY Slip Op 07379


Decided on November 1, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 1, 2018

525552

[*1]In the Matter of JESSICA O'CONNOR, Petitioner,
v
RICHARD C. CUTTING, as Sheriff of the County of Essex, et al., Respondents.

Calendar Date: September 4, 2018

Before: McCarthy, J.P., Devine, Aarons, Rumsey and

 Pritzker, JJ.

Tully Rinckey PLLC, Albany (Michael Macomber of counsel), for petitioner.
Daniel T. Manning, County Attorney, Elizabethtown, for respondents.



MEMORANDUM AND JUDGMENT
Rumsey, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondents terminating petitioner's employment.
Petitioner had been employed by respondent County of Essex Sheriff's Department as a deputy sheriff for approximately 13 years when she was involved in a workplace altercation with another deputy sheriff, Shawn Lydamore. Following the incident, Lydamore filed a workplace violence incident report alleging, among other things, that petitioner had verbally attacked her. After investigation, four disciplinary charges were levied against petitioner. After a Civil Service Law § 75 hearing was held, the appointed Hearing Officer partially sustained two of the four charges, dismissed all remaining charges and recommended that petitioner be suspended for two months without pay. Thereafter, respondent Richard C. Cutting, the Sheriff of the County of Essex, appointed respondent Daniel L. Palmer, the County Manager, to make the final determination. Based on a review of the hearing transcripts and exhibits, Palmer issued a determination that rejected the Hearing Officer's findings, sustained three of the charges and recommended that petitioner's employment be terminated. Cutting then terminated petitioner's employment. Petitioner thereafter commenced this CPLR article 78 proceeding seeking to annul Palmer's determination finding her guilty of the disciplinary charges or, alternatively, to vacate the penalty of dismissal. Supreme Court transferred the matter to this Court, and we confirm.
The charges stem from an incident during which petitioner and a fellow deputy sheriff, Robert Budwick, who was also petitioner's live-in boyfriend, engaged in a heated verbal exchange with Lydamore in the patrol room that is located in the same building as the [*2]Essex County Jail while all were on duty. On the date of the incident, petitioner was assigned to road patrol duty. Approximately two hours after she went on patrol, petitioner decided to return to the patrol room to take her meal break. Although it is customary for employees to take meal breaks in the jail building, there was a general policy prohibiting deputies from "hang[ing] out" in the building when assigned to road patrol duty. On her way to the patrol room, petitioner heard a dispatch call for Lydamore that went unanswered and volunteered to take the call. After responding to the call regarding an erratic driver, for which she issued no citation, petitioner continued to the jail to have her meal break and to complete paperwork associated with the traffic stop.
Upon arriving at approximately 4:00 p.m., petitioner noticed that Lydamore's patrol vehicle was parked in the front of the building. Petitioner searched for Lydamore briefly before being advised that she was in the jail. Petitioner spoke by telephone with Alan Leon, a sergeant with the Department who was supervising the deputies assigned to road patrol, to complain that Lydamore was at the jail rather than on road patrol. Leon testified that he informed petitioner that Lydamore had his permission to be at the jail to install a car seat for a member of the public. At approximately 5:30 p.m., petitioner again called Leon to ask if he was going to address Lydamore's presence at the jail because she was concerned that Lydamore's presence in the jail would result in another "lecture" to all deputies directing them to refrain from being at the jail when assigned to road patrol. Leon responded by asking why petitioner was in the patrol room and ordering her to resume road patrol.
Following the second exchange with Leon, petitioner did not return to road patrol; rather, after she completed the erratic driver incident report, she remained in the patrol room and proceeded to work on completing paperwork for an unrelated incident. Petitioner testified that Budwick and William Rohrer Jr., another deputy sheriff, entered the patrol room and she informed them of Lydamore's presence in the jail. Two more deputy sheriffs, Kyle Young and Justin Bobbi, then entered the patrol room; Lydamore entered the patrol room shortly thereafter. Lydamore testified at the hearing that Budwick immediately "bombarded" her by "screaming and yelling at the top of his lungs," asking her questions, such as "what the f*** are you doing" and "are you trying to mess everything f***ing up for all of us [by being at the jail]?" Lydamore responded by stating that she had permission to be at the jail to install a car seat. Petitioner then stood and loudly proclaimed, "[Lydamore] was f***ing useless and never [has] done [her] job correctly" and, further, expressed resentment that she had to take the erratic driver call when Lydamore did not respond because she was not in her patrol zone.
Rohrer, who stated that he is "good friends" with petitioner and Budwick, testified that he exited the patrol room when Lydamore entered because he knew that Budwick was going to confront Lydamore and that he "just felt like . . . [he] needed to get out of there" and "[did not] want to be involved." Bobbi, who is petitioner's cousin, testified that he was only present in the patrol room briefly and left shortly after Lydamore arrived because he "could feel the tension." Laura Carter, a cook at the jail, testified that she was clocking out at the end of her shift when she heard yelling coming from the patrol room, including a person whom she believed was petitioner stating that "you're f***ing worthless." In the middle of the altercation, petitioner briefly exited the patrol room to deliver cookies to Carter before returning to the room.
"The standard of review to be applied in reviewing an administrative determination made pursuant to Civil Service Law § 75 is whether the determination is supported by substantial evidence in the record as a whole" (Matter of Kuznia v Adams, 106 AD3d 1227, 1229 [2013] [internal quotation marks, brackets and citations omitted]). Initially, we find unavailing petitioner's argument that Palmer improperly substituted his own credibility determinations for those of the Hearing Officer. The credibility determinations of a hearing officer are not binding upon the official charged with making a final determination, who, in the exercise of his or her duty to weigh the evidence and resolve conflicting testimony, may make different factual findings and conclusions, provided they are supported by substantial evidence (see Matter of Simpson v Wolansky, 38 NY2d 391, 394 [1975]; Matter of Benson v Cuevas, 293 [*3]AD2d 927, 930 [2002], lv denied 98 NY2d 611 [2002]; Matter of Stowe Potato Sales v McGuire, 203 AD2d 755, 757 [1994], lv denied 84 NY2d 802 [1994]).
In a lengthy and detailed decision, Palmer provided specific reasons for his credibility determinations that were supported by logical inferences drawn from the testimony and the additional evidence that had been adduced at the hearing. He specifically found Carter to be the most credible witness because she was unbiased and had happened upon the confrontation by chance with no prior knowledge of any potential conflict. By contrast, he found petitioner to be the least credible witness. Palmer concluded that the evidence showed that the altercation with Lydamore was not a sudden emotional outburst, but evinced a level of planning with Budwick. In that regard, he specifically noted that petitioner, who had no duty or authority to supervise Lydamore, nonetheless immediately became concerned about Lydamore's whereabouts when Lydamore failed to respond to the dispatch call and hurried back to the jail where she immediately commenced a search for Lydamore. Upon finding that Lydamore was at the jail, petitioner called Leon to register a complaint. Although petitioner herself remained at the jail — in violation of the same policy that she wanted enforced against Lydamore — she called Leon a second time to again complain about Lydamore and to demand that he take action. Palmer noted that both Rohrer and Bobbi had anticipated the confrontation and exited the room. He also found it significant that petitioner did not similarly exit the room when Budwick initially confronted Lydamore, but, instead, remained and admittedly participated by making a statement critical of Lydamore. Palmer further noted that petitioner returned to the conflict after she briefly left the patrol room to deliver the cookies to Carter.
Based on his review of the evidence, Palmer concluded that petitioner was guilty of charge one for conspiring with Budwick to knowingly and intentionally verbally harass Lydamore. He further found petitioner guilty of charge two because she disobeyed the direct order of Leon, her superior officer, that she return to road patrol and because she had been insubordinate during the telephone calls that she made to him. Palmer partially sustained charge four, by concluding that petitioner was guilty of failing to attend to her assigned job duties when she failed to return to road patrol after being ordered to do so by Leon [FN1]. We conclude that Palmer's factual findings and conclusions are supported by substantial evidence.
We further conclude that the penalty of termination is not excessive. "[A] penalty must be upheld unless it is so disproportionate to the offense as to be shocking to one's sense of fairness, thus constituting an abuse of discretion as a matter of law. This calculus involves consideration of whether the impact of the penalty on the individual is so severe that it is disproportionate to the misconduct, or to the harm to the agency or the public in general" (Matter of Kelly v Safir, 96 NY2d 32, 38 [2001] [internal quotation marks and citations omitted]). We are mindful that great leeway must be accorded in matters concerning police discipline because "a higher standard of fitness and character pertains to police officers than to ordinary civil servants" (Matter of Bassett v Fenton, 68 AD3d 1385, 1387-1388 [2009] [internal quotation marks, brackets and citation omitted]; see Kelly v Safir, 96 NY2d at 38). Moreover, inasmuch as strict discipline is essential for law enforcement administration, the penalty of dismissal has been routinely upheld for officers who have disobeyed direct orders (see Matter of Oliver v D'Amico, 151 AD3d 1614, 1617-1618 [2017], lv denied 30 NY3d 913 [2018]; Matter of DiLauria v Police Commrs. of Town of Harrison, 285 AD2d 464, 464 [2001]; Matter of Hammond v City of Amsterdam, 185 AD2d 495, 497 [1992]). Thus, we cannot say that dismissing petitioner from her position as a deputy sheriff for disobeying a direct order shocks our sense of fairness.
McCarthy, J.P., Devine, Aarons and Pritzker, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: Palmer dismissed the remainder of charge four and all of charge three.